AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS
Sep 6, 2024
OFFICE OF THE CLERK

# UNITED STATES DISTRICT COURT

for the
Western District of Arkansas
Fort Smith Division

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

The Premises Located at 4511 Whitetail Point, Van Buren, AR 72956

Case No. 2:24-CM- 00059

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The Premises Located at 4511 Whitetail Point, Van Buren, AR 72956, more particularly described on Attachment A.

located in the Western District of Arkansas, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 USC 2252A(a)(2) | Receipt or Distribution of Child Pornography |
| 18 USC 2252A(a)(5)(B) | Possession of or Access with Intent to View Child Pornography |

The application is based on these facts:

☑ Continued on the attached sheet. **Affidavit of HSI Task Force Officer Jonathan Arredondo.**

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* ___________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Jonathan Arredondo
*Applicant's signature*

Jonathan Arredondo, HSI Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 9/6/24

Mark E. Ford
*Judge's signature*

City and state: Fort Smith, Arkansas

Mark E. Ford, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the **SUBJECT PREMISES**, a single-family home, located on the north side of the street, at the east end of a dead-end street, located at **4511 Whitetail Point, Van Buren, AR 72956**. The house has light green color siding with white pane windows. The front door is a dark brown color with a glass window in the middle of the door. The house is elevated to match the foundation of being on a hill. The front door is facing South Towards the street. There is a front porch that leads to the front door that is uncovered. There is a Side door to the residence that is on the West end of the residence. Using the Van Buren Police Department Drone team I was able to observe the property from the sky. There is a back door that faces North that leads onto the back wooden patio. There is a gray and brown steel shed on the west end of the residence near the back door.

WRVBOR Listing # 1054616

## ATTACHMENT B

### Particular Things to be Seized

All records, documents, items, data, and other information that may constitute fruits or instrumentalities of, or contain evidence related to, violations of 18 U.S.C § 2252A(a)(2), Receipt or Distribution of Child Pornography or 18 U.S.C § 2252A(a)(5)(B) Possession of or Access with Intent to View Child Pornography, that may be found at the **SUBJECT PREMISES,** which is further described in Attachment A, including:

a. Images of child pornography and files containing images of child pornography in any form wherever it may be stored or found including, but not limited to:

i. Any computer, cellular phone, computer system, smart phones, computer tablets, and related peripherals; tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, web cams, scanners, computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to cellular telephones, hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography, or information pertaining to an interest in child pornography;

ii. Books and magazines containing visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

iii. Originals, copies, and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

iv. Motion pictures, films, videos, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

b. Contact information or correspondence (online conversations/ Chats) pertaining to the possession, receipt or distribution of visual depictions of minors engaged in sexually

explicit conduct, and/or the sexual solicitation of minors that were transmitted or received using a computer, or some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited to:

    i.    Electronic mail, internet chat logs, and electronic messages, social media messages, internet posts, blogs or any other internet-based contacts or communications, log in information to child exploitation forums, websites, and chatrooms;

    ii.    Envelopes, letters, books, ledgers, diaries, notebooks, notes, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256 or the solicitation of sexual conduct;

    c.  Peer-to-Peer software programs, including but not limited to eDonkey, BitTorrent and Gnutella.

    d.  Emails, log in information, credit card information, etc showing ownership or use of the premises or device, subscriptions to internet or phone services, or account information and subscriptions to online applications known for child exploitation, paid sites, and social media;

    e.  Records or other items which evidence ownership or use of computer equipment found in the above residence, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes.

    f.  Any and all computer hardware, to include data-processing devices containing central processing units, such as "desktop", "tower", "laptop" and "notebook" computers, hand-held electronic organizers, "personal digital assistants" and iPod's/iRiver's; "routers", "switchers" "Cellular Phones/Smart Phones" "Tablets" or any similar device which facilitates communication by sending transmissions to intended recipients and has the capability of creating logs; internal and external storage devices, including magnetic storage devices such as hard disk drives, diskette drives, and tape drives, optical storage devices such as CD-ROM drives, CD-R/CD-RW recorders, and DVD drives/recorders, and other memory storage devices such as smart-card readers. In addition, peripherals, equipment that send data to, or receive data from, computer hardware, but do not normally store user data, such as keyboards, mice, printers, scanners, plotters, video display monitors, modems, cables, and certain types of facsimile machines.

    g.  Any and all computer software and storage media to include any material capable of storing information in a manner that can be used by computer hardware to save and/or retrieve information, such as diskettes, CD-ROM's, CD-R's, CD-RW's, DVD's, DVD-R's, DVD-RW's, magnetic tapes, ZIP disks, JAZ disks, Peerless disks, SparQ disks, ORB disks, optical disks, smart-cards, EPROMS, and digital memory media such as CompactFlash, SmartMedia, Sony

Memory Sticks, and USB "thumb" or "key" drives, in addition to computer photographs, Graphic Interchange formats and/or photographs, cameras, digital cameras, slides, scanners or other visual depictions of such Graphic Interchange format equipment which may be, or are used to visually depict child pornography, child erotica, information pertaining to the sexual interest in children, sexual activity with children, or the distribution, possession or receipt of child pornography, child erotica or information pertaining to an interest in child pornography or child erotica.

h. Any and all computer-related documentation to include written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items. In addition to passwords, to include alphanumeric strings, pass-phrases, password files, and similar decryption codes necessary to access data that is encrypted or otherwise inaccessible. Any and all security devices, to include physical keys, encryption devices, "dongles", and similar physical items needed to gain access to associated computer hardware.

i. Any and all address books, mailing lists, lists of names and addresses of minors, supplier lists, mailing address labels, and any and all documents and records pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce including by United States Mails or by computer, any visual depiction of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256 or minor contacted for sexual purposes.

j. Any data that is encrypted and unreadable will not be returned unless law Enforcement personnel have determined that the data is not (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offense specified above.

k. In searching the data, the computer personnel may examine and copy all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized. In addition, the computer personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized. Finally, the computer forensic personnel may access any and all applications, email accounts, social media, internet search terms and history, and/or documents contained upon any said device to determine relevancy.

During the execution of the search of the premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of **JUSTIN VANG** or any person found to reside at the **SUBJECT PREMISES** and reasonably believed by law enforcement to be a user of a digital devise(s) found at the premises, to the fingerprint scanner of the digital device(s); (2) hold a digital device found at the premises in front of the face **JUSTIN VANG** or any person found to reside at the **SUBJECT PREMISES** and reasonably believed by law enforcement to be a user of a digital device(s) found at the premises, to activate the facial recognition feature, for the purpose of attempting to unlock the digital device(s) and applications in order to search the contents as authorized by this warrant.

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Homeland Security Investigations, Task Force Officer Jonathan Arredondo, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for premises located at **4511 Whitetail Point, Van Buren, Arkansas, 72956** ("SUBJECT PREMISES"). This affidavit contains sufficient information to establish probable cause for the requested warrant but does not include all of the information known to me in this investigation.

2. I am a Task Force Officer (TFO) with the Homeland Security Investigations (HSI) and have been since March 1, 2024. Prior to becoming a TFO with HSI, your Affiant attended the Arkansas Law Enforcement Training Academy in Fort Smith, Arkansas, in 2018. Your Affiant has been a sworn police officer with the Van Buren Police Department for six years. I was assigned to the patrol division of the police department for three years. I have spent the last three years in the Criminal Investigations Division of the police department. Subsequent to being assigned to criminal investigations, I became a part of the Internet Crimes Against Children (ICAC) task force for the State of Arkansas. I have cooperated with federal, state, and local law enforcement agencies in my investigations, and during said investigations, I have utilized numerous investigative techniques, including interviewing, surveillance, execution of arrest and search warrants, and other investigative techniques. From the cases I have worked I have gained a good working knowledge of investigating different types of crimes including, but not limited to, offenses involving child exploitation and child pornography, murder, rape, sexual assault, robbery, burglary, battery, aggravated assault, and theft of property.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that there is now located at **4511 Whitetail Point, Van Buren, Arkansas, 72956, the SUBJECT PREMISES**, evidence violations of Title 18, United States Code, Sections 2252A(a)(2), Receipt or Distribution of Child Pornography, and 2252A(a)(5)(B), Possession of or Access with Intent to View Child Pornography.

## STATUTORY AUTHORITY AND DEFINTIONS

5. This investigation concerns alleged violations of, inter alia, Title 18, United States Code, Sections 2252A(a)(2), Receipt or Distribution of Child Pornography, and 2252A(a)(5)(B), Possession of, or Accessing with Intent to View, Child Pornography.

6. Under Title 18, United States Code, Section 2252A(a)(2), it is a federal crime for any person to knowingly receive or distribute any child pornography, or any material that contains child pornography, using any means or facility of interstate or foreign commerce, or that has been mailed, shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

7. Under Title 18, United States Code, Section 2252A(a)(5)(B), it is a federal crime for any person to knowingly possess, or access with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce by any means,

including by computer, or that was produced using materials that have been mailed, or shipped 5 or transported in or affecting interstate or foreign commerce by any means, including by computer.

8.     Title 18, United States Code, Section 2256 defines certain terms used in Title 18 United States Code, Sections 2251 et seq. (which encompasses Section 2252A), including the following:

a. "Child pornography" means any visual depiction, including any photograph, film, video, picture, or computer or computer generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; or such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or where such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct. 18 U.S.C. § 2256(8).

b. "Sexually explicit conduct" means actual or simulated (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the anus, genitals, or pubic area of any person. 18 U.S.C. § 2256(2)(A)

c. "Minor" means any person under the age of eighteen (18) years. 18 U.S.C. § 2256(1).

d. "Identifiable minor" means a person who was a minor at the time the visual depiction was created, adapted, or modified, or whose image as a minor 6 was used in creating, adapting, or modifying the visual depiction, and who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature, and shall not be construed to require proof of the actual identity of the identifiable minor.

Lastly, Title 18, United States Code, Section 2253(a)(3), provides that a person who is convicted of an offense under Title 18 United States Code, Section 2252 or 2252A, shall forfeit to the United States such person's interest in any property, real or personal, used or intended to be used to commit or to promote the commission of such offense.

## TECHNICAL TERMS

9. Based on my training and experience, I am using the following technical terms to convey the following meanings:

10. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

11. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

12. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

**PEER-TO-PEER FILE SHARING ON THE BITTORRENT NETWORK**

13. Law Enforcement uses specialized "peer to peer" (P2P) software to locate computers offering to participate in the distribution of child pornography images and files over P2P sharing networks in Arkansas. Millions of computer users throughout the world use P2P file sharing networks to share files containing music, graphics, movies and text. These networks have also become a popular way to download and distribute child pornography. Any computer user who can connect to the Internet can download P2P application software, which is typically free, and use it to share files through a P2P network.

14. The BitTorrent network is a very popular and publicly available P2P file sharing network. Most computers that are part of this network are referred to as "peers" or "clients". A peer/client can simultaneously provide files to some peers/clients while downloading files from other peers/clients.

15. The BitTorrent network can be accessed by peer/client computers via many different BitTorrent network client (software) programs, examples of which include the BitTorrent client program, uTorrent client program, and Vuze client program, among others.

These client programs are publicly available and typically free P2P client software programs that can be downloaded from the Internet.

16. During the installation of typical BitTorrent network client programs, various settings are established which configure the host computer to share files via automatic uploading.[1] Typically, as users download files or pieces of files from other peers/clients on the BitTorrent network, other users (peers/clients) on the network are able to download the files or pieces of files from them, a process which maximizes the download speeds for all users on the network. Once a user has completed the download of an entire file or files, they can also continue to share the file with individuals on the BitTorrent network who are attempting to download all pieces of the file or files, a process referred to as "seeding".

17. Files or sets of files are shared on the BitTorrent network via the use of "Torrents". A "Torrent" is typically a small file that describes the file(s) to be shared. It is important to note that "Torrent" files do not contain the actual file(s) to be shared, but do contain information about the file(s) to be shared needed to accomplish a download.

---

[1] It should be noted, during the downloading and installation of the publicly available uTorrent client program, the license agreement for the software states the following: "Automatic Uploading. uTorrent accelerates downloads by enabling your computer to grab pieces of files from other uTorrent or BitTorrent users simultaneously. Your use of the uTorrent software to download files will, in turn, enable other users to download pieces of those files from you, thereby maximizing download speeds for all users. In uTorrent, only files that you are explicitly downloading or sharing (seeding) will be made available to others. You consent to other users' use of your network connection to download portions of such files from you. At any time, you may uninstall uTorrent through the Add/Remove Programs control panel utility. In addition, you can control uTorrent in multiple ways through its user interface without affecting any files you have already downloaded, thereby maximizing download speeds for all users.”

18. This information includes things such as the name(s) of the file(s) being referenced in the "Torrent" and the "infohash" of the "Torrent." The "info hash" is a SHA-1[2] has value of the set of data describing the file(s) referenced in the "Torrent." This set of data includes the SHA-1 hash value of each file piece in the torrent, the file size(s), and the file name(s). The "info hash" of each "Torrent" uniquely identifies the "Torrent" file on the BitTorrent network. The "Torrent" file may also contain information on how to locate file(s) referenced in the "Torrent" by identifying "Trackers." "Trackers" are computers on the BitTorrent network that collate information about the peers/clients that have recently reported they are sharing the file(s) referenced in the "Torrent" file. A "Tracker" is only a pointer to peers/clients

19. "Trackers" are computers on the BitTorrent network that collate information about the peers/clients that have recently reported they are sharing the file(s) referenced in the "Torrent" file. A "Tracker" is only a pointer to peers/clients on the network who may be sharing part or all of the file(s) referenced in the "Torrent". "Trackers" do not actually have the file(s) but are used to facilitate the finding of other peers/clients that have the entire file(s) or at least a portion of the file(s) available for sharing. It should also be noted that the use of "Tracker(s)" on the BitTorrent network are not always necessary to locate peers/clients that have file(s) being

---

[2] The Secure Hash Algorithm (SHA) was developed by the National Institute of Standards and Technology (NIST), along with the National Security Agency (NSA), as a means of identifying files using a digital "fingerprint" that consists of a unique series of letters ad numbers. The United States has adopted the SHA1 hash algorithm described herein as a Federal Information Processing Standard. SHA-1 is the most widely used of the existing SHA hash functions and is employed in several widely used applications and protocols. A file processed by this SHA-1 operation results in the creation of an associated hash value often referred to as a digital signature. SHA-1 signatures provide a certainty exceeding 99.9% that two or more files with the same SHA1 signature are identical copies of the same file regardless of their file names.

shared from a particular "Torrent" file. There are many publicly available servers on the Internet that provide BitTorrent tracker services.

20. In order to locate "Torrent" files of interest and download the files that they describe, a typical user will use keyword searches on Torrent indexing websites, examples of which include isohhunt.com and the piratebay.org. Torrent-indexing websites are essentially search engines that users on the BitTorrent network use to locate "Torrent" files that describe the files they are looking to download. Torrent-indexing websites do not actually host the content (files) described by "Torrent" files, only the "Torrent" files themselves.

21. Once a "Torrent" file is located on the website that meets a user's keyword search criteria, the user will download the "Torrent" file to their computer. The BitTorrent network client program on the user's computer will then process that "Torrent" file in order to find "Trackers" or utilize other means that will help facilitate finding other peers/clients on the network that have all or part of the file(s) referenced in the "Torrent" file. It is again important to note that the actual file(s) referenced in the "Torrent" are actually obtained directly from other peers/clients on the BitTorrent network and not the "Trackers" themselves. Typically, the "Trackers" on the network return information about remote peers/clients that have recently reported they have the same file(s) available for sharing (based on SHA-1 "info hash" value comparison), or parts of the same file(s), referenced in the "Torrent", to include the remote peers/clients Internet Protocol (IP) addresses.

22. For example, a person interested in obtaining child pornographic images or videos on the BitTorrent network can go to a torrent indexing website and conduct a keyword search using a term such as "preteen sex" or "pthc" (pre-teen hardcore). The results of the keyword search are typically returned to the user's computer by displaying them on the torrent indexing

website. Based on the results of the keyword search, the user would then select a "Torrent" of interest to them to download to their computer from the website. Typically, the BitTorrent client program will then process the "Torrent" file.

23. Utilizing "trackers" and other BitTorrent network protocols, peers/clients are located that have recently reported they have the file(s) or parts of the file(s) referenced in the "Torrent" file available for sharing. The file(s) are then downloaded directly from the computer(s) sharing the file or files.

24. Typically, once the BitTorrent network client has downloaded part of a file or files, it may immediately begin sharing the part of the file or files it has with other users on the network. The BitTorrent network client program succeeds in reassembling the file(s) from different sources only if it receives "pieces" with the exact SHA-1 hash value of that piece which is described in the "Torrent" file.

25. The downloaded file or files are then stored in an area (folder) previously designated by the user and/or the client program on the user's computer or designated external storage media. The downloaded file or files, including the torrent file, will remain in that location until moved or deleted by the user.

26. Law Enforcement can search the BitTorrent network in order to locate individuals sharing previously identified child exploitation material in the same way a user searches this network. Searching the network for these known torrents can quickly identify targets in their jurisdiction.

27. Law Enforcement receives this information from "Trackers" about peers/clients on the BitTorrent network recently reporting that they are involved in sharing digital files of known or suspected child pornography, based on "info hash" SHA-1 hash values of torrents.

These torrents being searched for are those that have been previously identified by law enforcement as being associated with known or suspected child pornography. There are BitTorrent network client programs which allow for single-source downloads from a computer at a single IP address, meaning that an entire file or files are downloaded only from a computer at a single IP address as opposed to obtaining the file from multiple peers/clients on the BitTorrent network. This procedure allows for the detection and investigation of those computers involved in sharing digital files of known or suspected child pornography on the BitTorrent network.

28. During the query and/or downloading process from a suspect BitTorrent network client, certain information may be exchanged between the investigator's BitTorrent client program and the suspect client program they are querying and/or downloading a file from. This information includes 1) the suspect client's IP address; 2) a confirmation from the suspect client that they have pieces of the file(s) being requested, in whole or in part, and that the pieces of the file(s) is being reported as shared from the suspect client program; and 3) the BitTorrent network client program and version being utilized by the suspect computer. Then law enforcement has the ability to log this information.

**CHILD PORNOGRAPHY SHARING ON BITTORRENT**

29. The investigation of P2P file sharing networks is a cooperative effort of law enforcement agencies around the country and throughout the world. Many of these agencies are associated with the Internet Crimes Against Children (ICAC) Task Force. P2P investigative methodology has led to the issuance and execution of search warrants around the country resulting in the arrest and conviction of thousands of offenders possessing and/or distributing child pornography, several of which were also personally involved in the sexual exploitation of real child victims.

30. Law enforcement has created BitTorrent network client programs that obtain information about peers/clients recently reporting that they are involved in sharing digital files of known actual child pornography (based on a hash value comparison), which then allows the downloading of a file from a single IP address (as opposed to obtaining the file from multiple peers/clients on the network). This procedure allows for the detection and investigation of those computers involved in sharing digital files of known actual child pornography on the BitTorrent network.

31. One method for an investigator to search the BitTorrent network for users possessing and/or disseminating child pornography files is to search for Torrents whose name contains terms that would be associated with child pornography files. The investigator would then download the file(s) associated with the Torrent and determine if the file(s) are in fact child pornography. If so, the investigator can document the hash value of this Torrent file and keep the Torrent file itself for use in a subsequent investigation.

32. Although transparent to the typical user, when searches are conducted, the software may return results of additional peers who recently reported that they have that file(s) in whole or in part. This information may include the IP addresses of those other peers. This information can be documented by investigators and compared to info hash values the investigator has obtained in the past and believes to be child pornography. This method allows for the detection and investigation of computers involved in possessing, receiving, and/or distributing files of previously identified child pornography. Therefore, without even downloading the file, the investigator can compare the info hash value and determine with high mathematical certainty that a file(s) seen on the network is an identical copy of a child pornography file(s) they had seen before.

33.     The returned list of IP addresses can include computers that are likely to be within the investigator's jurisdiction. The ability to identify the approximate location of these IP addresses is provided by IP geographic mapping services, which are publicly available and also used for marketing and fraud detection. At this point in the investigative process, an association between a known Torrent file (based upon the info hash value comparison) and a computer having a specific IP address (likely to be located within a specific region) can be established.

34.     Once a client user is identified as recently having a file(s) believed to be child pornography, in whole or in part, the investigator can then query that client user directly to confirm the client user has that file(s), in whole or in part, and/or download that file directly from the client user exclusively, otherwise known as a single-source download. The process of sharing files on the BitTorrent network involves peers allowing other peers to copy a file(s) or portions of a file(s).  This sharing process does not remove the file(s) from the computer sharing the file.

35.     If an investigator either received an affirmative response from a remote peer that they possess a digital file, or the investigator received a digital file that is believed to contain child pornography, the investigator can conclude that the sharing computer is running a BitTorrent network client and is currently possessing, receiving, and/or distributing specific and known visual depictions of child pornography. The investigator will also obtain information of the remote client's IP address, a confirmation from the remote client that they have pieces of the file(s) being requested, and the remote client program name and version number.

36.     All of the communication that occurs between the law enforcement client software and the remote peer's client exactly replicates the same communication that a standard user would have with that remote peer. There are no protocol modifications made with the law

enforcement software to give it special access or privileges that would not otherwise exist with a common P2P connection.

37. This method has proven to be extremely reliable in determining the location of computers that were involved in the P2P-facilitated sharing of child pornography. Nearly every case finds evidence of child pornography either existing, or previously existing on the suspect computer, and these investigations lead to thousands of arrests nationwide each year for possession and/or distribution of child pornography.

## PROBABLE CAUSE

38. On May 1, 2024, your Affiant was contacted by Investigator Wes Grube of the Benton County Sheriff's Office, within the Western District of Arkansas, about possible downloads from the Internet protocol (IP) address 66.148.32.74 involving suspected child pornography. Investigator Grube notified me that, utilizing the Benton County Sheriff's Office peer to peer (P2P) monitoring tool, he had received more than six thousand, seven hundred (6,700) still images and more than one thousand, eight hundred (1,800) video files associated with or containing child pornography or child sexual abuse material.

39. On May 3, 2024, Investigator Grube provided me copies of the downloaded files and associated log files. Your Affiant brought those files back to the Fort Smith HSI office and confirmed that multiple files met the federal definition of child pornography.

40. Four examples of such files are as follows:

a. Filename: "000150.avi"

MD5 Hash: 507ef183f4d04a814bdc36d9cb651f59

Duration: 59.96 seconds

Description: This video depicts a prepubescent female wearing a white Minnie Mouse shirt. At the eight second (:08) mark, the child lifts her shirt

and pulls her pants and underwear down, exposing her vagina. What appears to be an adult hand appears from behind the camera holding a syringe with a needle, which he then uses to stick or stab the child on the Labia Majora. At 45 seconds the child touches her vagina, and it appears that she spreads her vagina. The hand holding the syringe then pushes the needle inside of the vagina.

b. Filename: "!.Pthc.7yo.My.Little.Girls.-.Part.1.mpg"

MD5 Hash: 33d0b7932a7bcf8da3bfdcb3648d2850

Duration: 77.49 seconds

Description: This video begins with what appears to be a still image from a video of a nude, prepubescent female wearing a black, spiked collar, who appears to be crying, and is vaginally penetrated by an adult male penis. The child appears to be approximately 5 to 7 years old. The video later depicts an adult male holding the naked child while touching and attempting to insert his penis in her vagina. The sound of a crying child can be heard in the video. The video later displays red lettering that reads, "Whooo! Popped her cherry this time. Now I can fuck her little cunt real hard."

c. Filename: "(Pthc.Center)(Opva.)(2013).Toddler.Stuff.2011.(001-007.Merged).wmv"

MD5 Hash: 0477064e2078c9071367fckdf17cf528c

Duration: 4 minutes and 56 seconds

Description: The video depicts a prepubescent female lying on a bed on her stomach, wearing only a red sweater. The child appears to be approximately 3 to 5 years old. An adult male is kissing and licking the child's buttocks and later licking the child's exposed vagina.

d. Filename: "Cbaby-Beauty.3yo.Dick.Play.Lick.Cumshot.mpg"

MD5 Hash: 68f9f95273d0ae20f529c7872266e46

Duration: 397.8 seconds

Description: The video depicts a naked, prepubescent female lying on a bed with her legs apart, exposing her vagina and with a diaper lying next to her. The child appears to be approximately 2 to 3 years old. A naked,

adult male rubs his penis on the child's vagina and later has the child sit up and put her hands on his penis before he begins to shove his penis into the child's mouth.

41. On June 27, 2024, HSI Special Agent Jason Clarke submitted a United States Customs (administrative) subpoena for subscriber information for Internet Protocol address (IP) 66.148.32.74 to Wave Rural Connect. On June 27, 2024, your Affiant reviewed the returns sent from Wave Rural Connect, which showed the following:

a. IP address 66.148.32.74 was registered to Justin Aphen Vang at 4511 Whitetail Pt, Van Buren, AR 72956. This residence is located within the Western District of Arkansas, Fort Smith Division.

b. Service for this IP has been active from July 18, 2022, through the date of the return.

c. Payments on the account have been made on a recurring basis by a Visa Card in the name of Justin A Vang.

d. The subscriber phone number was listed 916-813-9640[3].

42. On July 2, 2024, your Affiant conducted surveillance on the **SUBJECT PREMISES**. Utilizing the Van Buren Police Department drone, Your Affiant viewed a green 2005 Toyota Highlander bearing Arkansas License Plate ACH43P that was in the driveway. This license plate returned to Justin A Vang and Zer Thao. The address listed for the license plate is 4511 Whitetail Pt, Van Buren, Arkansas.

[3] Using the Accurint comprehensive reporting tool, SA Clarke and I confirmed this number to be associated with Justin Vang.

43. A review of Arkansas Department of Motor Vehicle information revealed three current driver's licenses that list the **SUBJECT PREMISES** as residence: Justin Aphen Vang (date of birth 09/XX/1998), Zer Thao (date of birth 8/XX/1979), and Boua La Vang (date of birth 09/XX/1972).

44. Your Affiant knows and understands from multiple previous child pornography investigations that subjects who download this material will often keep copies of the material on multiple devices in addition to attempting to and/or succeeding in downloading child pornography material through any device for which they have constructive ownership. Your Affiant knows it is a common ability for cellular phones, or any device that can access the internet of today, to download nearly any file from the internet, as well as to transmit nearly any kind of file. Your Affiant also knows from previous child pornography investigations that smart phones or computers of the current time period are capable of downloading, installing, and running nearly any of the P2P client software, allowing access to these types of child pornography files. Your Affiant also knows it is possible to use today's smart cellular phones or computers in a wi-fi mode, on static IP address networks, such as the static IP address assigned to the **SUBJECT PREMISES**. The internet capable devices can be tethered to a single computer, small network, or standalone internet hotspot device via a USB cable. Once this is done, files can easily be transferred to or from the any device such as other computers, cell phones, or any device that can store and maintain data. This means any cell phone or computer can connect to just about any device or network to transmit or receive files.

**COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

45. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One

form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

46. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

47. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the

storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that

log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

48. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete

electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

49. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

50. Because multiple people may share the **SUBJECT PREMISES** as a residence, it is possible that the **SUBJECT PREMISES** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

**CONCLUSION**

51. I submit that this affidavit supports probable cause for a search warrant authorizing the search of the **SUBJECT PREMISES** described in Attachment A and the seizure of the items described in Attachment B.

52. Furthermore, I also request that this Court authorize law enforcement officers to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the **SUBJECT PREMISES** and reasonably believed by law enforcement to be a user of the device,

to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate any facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

Respectfully submitted,

Jonathan Arredondo
Jonathan Arredondo
Task Force Officer
Homeland Security Investigations

Subscribed and sworn to before me on September 6th, 2024.

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF ARKANSAS

Honorable Mark E. Ford
United States Magistrate Judge